UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO.: |
| **CHARIS HOSPITAL, L.L.C.** | **01-10616** |
| DEBTOR | CHAPTER 7 |

**MEMORANDUM OPINION**

The acrimonious reorganization of Charis Hospital, L.L.C. began in 2001. The court converted the failed reorganization to a chapter 7 liquidation after a confirmed liquidating plan unwound. The extent to which the debtor's post-confirmation affairs departed from the confirmed plan's scheme, and the extent of its deviations, only became evident during hearings on compensation applications filed by CalMed Consulting, Inc. ("CalMed"), the liquidator appointed pursuant to the Amended Third Immaterial Modification to Second Amended Liquidating Plan;[1] and its counsel, Jones, Walker, Waechter, Poitevent, Carrère & Denègre, L.L.P. ("Jones Walker"). At the same time the court took up a motion to approve CalMed's final report and other matters. This opinion addresses the compensation applications and CalMed's report.

**Facts**

I.  Procedural History of the Charis Hospital Reorganization

International Cooperative Consultants, Inc. d/b/a ICC Financial Group ("ICC") filed its "Amended Third Immaterial Modification to Second Amended Liquidating

---

[1] (P-160). CalMed was appointed liquidator by the court's October 25, 2001 order (P-185).

Chapter 11 Plan for Charis Hospital, LLC filed by ICC Financial Services" ("Confirmed Plan"), which the court confirmed September 28, 2001.[2] Though the Second Amended Liquidating Chapter 11 Plan that ICC originally filed ("Original Plan") was amended four times before confirmation to resolve specific issues, the final Confirmed Plan lacks clarity.[3] Most crucial for purposes of this opinion, Confirmed Plan article 16.14 states that "*All* immaterial modifications to the Second Amended Plan shall supercede [sic] any conflicting language in the Plan itself."(emphasis added.) This language is critical to the difference between the liquidator's role under the Confirmed Plan and that contemplated by earlier versions of the proposed plan.

The Original Plan anticipated the sale of Charis Hospital. That plan called for appointment of a liquidating trustee if the sale were not consummated, and allowed the trustee to hire and pay professionals without court approval.[4] In contrast, article 10.3 of the *Second* Immaterial Modification to the Original Plan, which addresses the liquidation of unsold assets of the debtor if the proposed sale took place, provided for court appointment of an independent entity, chosen by the Internal Revenue Service, to liquidate the debtor's accounts receivable. That independent entity was to report to the court on a quarterly basis concerning its billing and collection efforts. Second Immaterial Modification to Original Plan, Article 10.3, ¶1.

---

[2] (P-161). Although the order confirming the plan also mandated the filing of a motion for final decree within 45 days of the entry of that order, no party in interest ever has moved for a final decree.

[3] Notwithstanding the significant changes in the plan, the parties characterized the amendments as "immaterial modifications." As a result, the plan proponent avoided the duty to give creditors additional notice and an opportunity for a hearing on the proposed changes. *See* 11 U.S.C. §1127(a) and Fed. R. Bankr. P. 3019 (requiring notice and opportunity for hearing on material plan modifications).

[4] Second Amended Liquidating Chapter 11 Plan for Charis Hospital, Article X, §10.7. (P-104).

2

Unfortunately for one desiring to divine the parties' intent, the Confirmed Plan (which includes the Amended *Third* Immaterial Modification) also contains an Article 10.3. That article provides for appointment of a liquidator on motion of the Internal Revenue Service "to dissolve the debtor in the most tax efficient manner," and to take other actions. The Confirmed Plan also requires the liquidator to seek court approval to hire counsel to pursue certain legal actions.[5] Familiarity with these documents is essential to understanding what happened after the plan was confirmed.

After confirmation, the Internal Revenue Service moved *ex parte* to appoint CalMed Consulting, Inc. to serve as liquidator for all matters other than the disposition of the debtor's movable property.[6] The court approved CalMed's appointment by order entered October 26, 2001.[7] The order states that CalMed was selected to

> serve as the Court-appointed liquidator charged with effectuating the dissolution of the Debtor in the most tax efficient way, to take any other actions necessary to effectuate the dissolution of the Debtor under State law, to bill all claims that are outstanding; collect and liquidate all accounts receivable of the Debtor; report to the Court on a quarterly basis; and comply with all other requirements set forth in the confirmed liquidating plan.

---

[5] Because a confirmed plan essentially is a contract, ambiguities in a plan must be resolved by applying standard principles of contract interpretation. *In re Offshore Diving and Salvaging, Inc.*, 226 B.R. 185, 188 (Bankr. E.D. La. 1998). State law governs the construction of a contract. *In re Haber Oil, Inc.*, 12 F.3d 426, 443 (5th Cir. 1994). Louisiana law instructs a court to construe a contract provision, where possible, to give effect to the provision, rather than construing it in a way that renders the provision ineffective. La. Civ. Code art. 2049. Article 10.1 of the Original Plan is titled "Sale of Assets," which is comparable to the heading of article 10.3 of the Second Immaterial Modification to the Original Plan. Similarly, article 10.2 of the Original Plan bears the heading "Dissolution of Corporate Entities," which is consistent with the heading of article 10.3 of the Confirmed Plan. The numbering of the articles in the Second Amended Immaterial Modification to the Original Plan and in the Confirmed Plan apparently was intended to correspond to the numbering of the Original Plan, so the use of "Article 10.3" in both modifications was simply an error. This interpretation gives effect to the provisions of both modifications and comports with Confirmed Plan article 16.14's statement that *all* modifications to the Original Plan superseded any conflicting language in the Original Plan itself.

[6] (P-170). The court appointed Bonnette Auction Company, L.L.C. to liquidate the debtor's movables.

[7] (P-185).

3

The application to appoint liquidators recited in paragraph 5 that the liquidators would submit applications setting forth the terms and conditions of their compensation once they had been appointed.[8]  Accordingly, on January 7, 2002 CalMed applied for approval of its compensation and reimbursement arrangement.[9]  The May 14, 2002 Order Approving Terms of Compensation and Reimbursement for CalMed Consulting, Inc. Liquidator[10] specified the terms on which CalMed would be paid, and also provided that the liquidator's compensation was subject to bankruptcy court review and approval. Indeed, the order's final paragraph recited that "all compensation and reimbursement for expenses incurred shall be subject to review and approval by and paid only as provided by order of this Court, including any subsequent Order establishing a procedure for the payment of the Liquidator and its professionals."

Meanwhile, CalMed also had applied to retain Jones Walker as its counsel pursuant to Bankruptcy Code §327.[11]  CalMed's application recited in paragraph 8 that "[a]ll of Jones Walker's fees and expenses will be subject to Bankruptcy Court approval." In an accompanying verified statement, a Jones Walker partner recited that "[i]t is understood that, in accordance with the Bankruptcy Code, final payment and all interim payments are subject to approval by this Court."  The January 15, 2002 order granting the

---

[8]  Ex Parte Motion to Appoint Liquidators, ¶5. A Supplement to Ex Parte Motion to Appoint Liquidators (P-173) provided additional information about the two companies to be engaged, but did not specify the method of compensating them.

[9]  (P-221). The minute entry from a February 8, 2002 hearing indicates that the liquidator's compensation remained an issue even then, four months after confirmation.

[10]  (P-279). The liquidator's counsel submitted the order. For reasons not apparent from the record, the order granting the application was not signed until after the appointment of the current bankruptcy judge, successor to Bankruptcy Judge Louis M. Phillips, who had presided over plan confirmation and the first several months of the Charis liquidation.

[11]  (P-220). CalMed's reasons for citing 11 U.S.C. §327 in support of its application to employ Jones Walker are not apparent from the record.

4

application authorized the liquidator to employ Jones Walker on the terms and conditions set forth in the application, and stated that Jones Walker would be compensated "as provided by order of this Court, including any Order that might subsequently be entered that establishes a procedure for the payment of the Liquidator and its professionals."[12]

The record contains no indication of any later order modifying the process of compensating the liquidator and its counsel, or relieving them from obtaining court approval for payment of fees and reimbursement of expenses.

After CalMed and its counsel were appointed, the liquidator filed a number of lawsuits to recover avoidable transfers. All these adversary proceedings were resolved by default judgment or compromise within nine months after their filing.[13] The record also reflects motion practice concerning claims, including the application for compensation of debtor's counsel, and other matters typical of the post-confirmation period in any liquidating chapter 11. Notably absent from the record are any reports from CalMed between its initial report of January 15, 2002 and July 11, 2003, despite the February 8, 2002 order directing CalMed to file status reports every 60 days.[14]

The first hints of problems in the Charis liquidation surfaced when the debtor's former insiders, William and Carolyn Carroll ("Carrolls") and Michael and Pamela Alonso ("Alonsos"), objected to the allowance and payment of compensation to former debtor's counsel. They objected in part because the liquidator had not complied with the

---

[12] (P-226).

[13] The liquidator filed all the complaints to recover avoidable transfers in March 2003.

[14] (P-239).

February 8, 2002 order directing CalMed to submit status reports.[15] At about the same time, another insider, William Carroll, III, moved for an order directing the liquidator to file more comprehensive reports.[16]

At an August 8, 2003 hearing, the court ordered the liquidator to resume filing status reports every 60 days, and gave it ten days to file all reports for periods before that covered by the July 11, 2003 report.[17] CalMed filed its first 60-day report on September 11, 2003 and drew an objection from William Carroll, III,[18] culminating in the court's ordering CalMed to provide to the Carrolls' attorney income and expense statements, bank statements, canceled checks, a narrative of developments over the previous 60 days, receipts, disbursement schedules and Medicare reports.[19] On December 31, 2003, the liquidator filed the October and November 2003 reports.[20] However, over the next three months CalMed filed no reports, so William Carroll, III again moved to compel the liquidator to produce them.[21]

---

[15] (P-355, P-363). The Carrolls and the Alonsos argued that the liquidator's July 11, 2003 Supplemental Interim Report was incomplete. Since their initial complaints about the liquidator's failings, the reason for the insiders' objections has become clear: they feared responsible party liability for the debtor's unpaid payroll taxes incurred during the chapter 11 reorganization. The Alonsos contended that CalMed should have collected enough funds to pay the IRS tax claim in full, or at least reduce it. However, in the August 20, 2003 ruling on debtor's counsel's fees, the court held that the Carrolls had no standing to contest the fees because they had conceded they would receive no distribution on their unsecured claims. (P-372).

[16] (P-362).

[17] Order setting September 11, 2003 deadline for filing interim reports. (P-370).

[18] (P-378).

[19] This ruling is reflected only in the minute entry for the December 12, 2003 hearing on William Carroll's objection to the September 11, 2003 report and a status conference set by the court. Apparently, no order was submitted to the court.

[20] (P-385).

[21] (P-387).

Before CalMed filed any more reports, the IRS moved to terminate the liquidator and for a final accounting, alleging that CalMed's liquidation had ceased to be effective.[22] The United States Trustee joined in the request, claiming that CalMed had not provided disbursement information and that the liquidator had failed to pay a substantial amount in quarterly fees.[23] After an April 23, 2004 hearing, the court terminated the liquidator and converted the case to a chapter 7 liquidation.[24] The court also orally ordered the liquidator to file a final accounting in 30 days. On motion of the liquidator, the court extended that deadline to July 30, 2004.[25]

The conversion brought no conclusion to the wrangling. The United States Trustee next was forced to move for an order compelling CalMed to turn over information the court specified at the April 2004 hearing.[26] CalMed later filed its Liquidator's Report of Administration[27] and then numerous monthly reports, which in turn triggered a round of additional objections to the accounting, and requests for further relief.[28]

---

[22] IRS's Motion to Terminate Liquidator and for Liquidator to Submit a Final Accounting (P-388).

[23] U. S. Trustee's Response to Motion to Terminate Liquidator and for Liquidator to Submit Final Accounting (P-394).

[24] (P-395).

[25] (P-413). In the meantime, the IRS obtained an order compelling the liquidator to file Charis's federal income tax returns for the years 2000 through 2003. (P-402).

[26] Order Granting United States Trustee's Motion to Compel. (P-433).

[27] (P-442, P-444).

[28] The matters included multiple Motions to Compel Liquidator to File Financial Accounting and Reports filed by William Carroll, III (P's-362, 378 and 387); Motion to Terminate Liquidator and for Liquidator to Submit Final Accounting filed by the Internal Revenue Service (P-388); Motion to Compel CalMed to Provide Distribution Information filed by the United Stated Trustee ("UST") (P-428); Motion to Compel CalMed to File for Compensation and Reimbursement of Expenses filed by UST (P-526); Motion to Examine Fees of Jones, Walker filed by UST (P-531); Motion to Compel Filing of an Accounting of Liquidation of Movables of Charis Hospital filed by UST (P-537); Motion to Compel CalMed to Comply

7

In November 2005, the United States Trustee moved to compel CalMed to file an application for compensation.[29] The court granted the unopposed motion, and its December 5, 2005 order set a deadline of December 21, 2005 for the filing of that application.[30]

In December 2005, the United States Trustee moved to examine Jones Walker's fees.[31] It also moved to compel the liquidator to account for proceeds of the debtor's movables.[32] After a January 6, 2006 hearing, the court granted the motion to examine fees and directed Jones Walker to file a fee application within thirty days.[33]

The United States Trustee's several motions allege that without the court's approval and in violation of its orders, the liquidator paid professional fees, claims and its own compensation.

## II. Hearing on Compensation and Final Report

Stacy Calvaruso testified for the liquidator at the hearing on the liquidator's and its counsel's applications for compensation and on the liquidator's final report. Calvaruso was CalMed's chief executive officer and majority shareholder.[34] She testified that she understood that CalMed's job as liquidator was to collect Charis's accounts receivable.

---

with Court Order and for Sanctions filed by UST (P-545) and Objections to the Liquidator's Final Report filed by William and Carolyn Carroll (P-473), William Carroll, III (P-474) and the UST (P-600).

[29] (P-526).

[30] (P-530).

[31] (P-531).

[32] (P-537).

[33] January 23, 2006 Order Granting U.S. Trustee's Motion to Examine Fees Of Jones, Walker, Waechter, Poitevent, Carrère & Denègre, L.L.P., Counsel for Calmed Consulting, Inc., the Liquidator (P-544).

[34] Calvaruso testified that she owned fifty-one percent of its shares, and that the company had been dissolved. CalMed offered no documents to corroborate that the corporation had been dissolved formally.

She also testified about CalMed's difficulties collecting the debtor's receivables, including missing documentation, the challenge of recreating patient billing statements from doctors' charts, and other problems including unpaid treating physicians' refusal to sign medical records CalMed needed to bill claims.

According to Calvaruso, CalMed deposited all funds it collected on behalf of the debtor, including proceeds of the Charis hospital sale, into a single account at the Hibernia National Bank, from which it paid claims. CalMed paid $350,000 of the Internal Revenue Service's $457,000 chapter 11 administrative priority claim. Ms. Calvaruso testified that she did not pay the claim in full based on advice of CalMed's counsel that the partial payment was a settlement of the IRS's prepetition and postpetition claims.

The evidence revealed that CalMed did not comply with the court's orders concerning the liquidator. Specifically, the court had ordered CalMed to obtain a fidelity bond in February 2002.[35] CalMed did not comply with the court's December 7, 2005 order directing the liquidator to provide evidence of the fidelity bond, because it never obtained a bond. Calvaruso admitted that CalMed decided not to obtain a fidelity bond based on her understanding that CalMed's errors and omissions insurance covered liabilities that a fidelity bond would have covered. She also conceded that CalMed had not filed status reports every 60 days as the court ordered, but testified that she had understood that Judge Phillips did not want status reports every 60 days, despite the February 8, 2002 order. Ms. Calvaruso also testified that she did not realize that CalMed was required to file fee applications.

---

[35] Order to Show Cause regarding fidelity bond. (P-535). The minute entry of the hearing held on February 2, 2002 reflects that the liquidator's counsel was to submit an order concerning a bond for CalMed.

9

The record contains no justification for CalMed's failure to obey the court's orders, including any corroboration, such as a hearing transcript, for the liquidator's contention that Judge Phillips intended to modify his order requiring status reports.

Glyn Miller, C.P.A., a financial analyst on the United States Trustee's staff, prepared several reports[36] based on his review of the liquidator's final report, bank statements and the claims register. Mr. Miller testified that CalMed's monthly fee exceeded deposits to the Charis account from November 2002 through July 2003 (with the exception of April 2003). Mr. Miller also opined that CalMed should have "given up" collection of the debtor's accounts receivable when collection ceased to be cost effective.

Mr. Miller's research revealed that CalMed paid $178,210.27 in attorney's fees, including those of its own counsel. It also paid itself a liquidator's fee of $188,732.17, though it had stopped collecting its $3,500 monthly fee in mid-2003. The court approved only three of the legal fee payments, for a total of $72,729.68.[37] Mr. Miller concluded from his review of the liquidator's final report and supporting documents that in May 2002 CalMed held enough money to pay the Internal Revenue Service claim in full. He also opined that because the liquidator only paid the IRS claim in part, notwithstanding a court order directing its payment,[38] penalties and accruing interest increased the claim by $62,000.

---

[36] Exhibits UST 4, 5 and 6.

[37] The court never approved an award of fees for CalMed or its attorney: in fact, neither ever applied for compensation until the court ordered them to do so on December 5, 2005 and January 23, 2006, respectively.

[38] Mr. Miller was mistaken on this point. The court's January 14, 2002 order did not direct payment of the IRS claim. It merely *allowed* the claim.

10

However, Mr. Miller admitted on cross-examination that he could not opine as to the amount the liquidator should have reserved to pay chapter 11 administrative claims, some of which had not even been resolved in May 2002. On redirect, the UST offered into evidence the February 11, 2002 court order setting deadlines, including the deadline for filing *all* proofs of claim and for the liquidator to object to *all* proofs of claim.[39] That order also scheduled a March 15, 2002 hearing to take up the allowance and payment of claims, including administrative expense claims.

At the March 15, 2002 hearing, the court directed counsel for CalMed to prepare orders identifying the approved administrative claims and the amounts of those claims, and authorizing a reserve for disputed claims and UST quarterly fees. No evidence established whether counsel for CalMed ever submitted the proposed orders to the court, and in any case neither of the orders ever was signed and entered. As a result, CalMed never was authorized to pay the claims identified at the March 15, 2002 hearing, and it did not establish a disputed claim reserve.

## Analysis

### I.   CalMed's and Jones Walker's Compensation

#### A.   Plan Provisions

The Original Plan provided for appointment of a liquidating trustee only if the proposed sale of Charis Hospital was not consummated. However, the court never appointed that liquidating trustee because the hospital was sold. Instead, the Original Plan was modified to provide that independent third parties would liquidate Charis's

---

[39] (P-239).

11

remaining assets.[40] The revised plan did not give the receivables liquidator the powers that the earlier version of the plan would have conferred on the liquidating trustee, who was to be a trustee of a trust formed pursuant to state law. Instead, the revised plan provided that the non-trustee liquidator would bill and collect the debtor's receivables, and dissolve the debtor using state law procedures, while regularly reporting to the court concerning its progress.[41]

### B.     Court Orders

Jones Walker prepared the May 14, 2002 order approving CalMed's compensation and reimbursement. That order recites that CalMed's fees and expenses are subject to the court's review for approval *and payment*. So too, the January 15, 2002 order employing Jones Walker as CalMed's counsel also specifically provides that Jones Walker's compensation was subject to court approval.[42] No later order modified either of these two orders, nor was either order appealed. The record does not reflect any orders approving payment of fees or expenses for CalMed or Jones Walker.

Jones Walker argues that neither it nor CalMed should have been required to obtain court approval of their post-confirmation compensation. Jones Walker maintains that Judge Phillips said at a February 8, 2002 hearing that the compensation arrangement he intended to approve was not subject to any court review until the liquidator's final report was submitted.

---

[40] Second Immaterial Modification, §10.3 (P-153).

[41] Second Immaterial Modification to Original Plan (P-153) and Confirmed Plan (P-160).

[42] Jones Walker's application to be employed as CalMed's counsel (P-220) sought employment pursuant to 11 U.S.C. §327(a). The January 15, 2002 order approving the firm's employment includes language regarding lack of adverse interest and disinterestedness that tracks the provisions of §327(a).

No party submitted a transcript of the February 8, 2002 hearing or any other hearing, so whether Judge Phillips may have said what Jones Walker contends cannot be known. However, in any case the written orders of January 5, 2002 and May 14, 2002 are controlling, regardless of any statements Judge Phillips may have made from the bench. *See Hendrick v. Avent*, 891 F.2d 583, 586 (5th Cir. 1990) (bankruptcy judge's statements during hearing that the bankruptcy trustee should investigate facts surrounding the sale being approved at hearing did not affect the finality of written bankruptcy court order approving the trustee's sale).

C.   Review of Compensation

The court approved Jones Walker's employment as counsel for CalMed pursuant to 11 U.S.C. §327. Accordingly, reasonable compensation for the services rendered by Jones Walker was subject to the court's review under 11 U.S.C. §330. As courts of equity, bankruptcy courts have broad discretion regarding the professional fees awarded in bankruptcy proceedings. *In re Prudhomme*, 43 F.3d 1000, 1003 (5th Cir. 1995); *In re Anderson*, 936 F.2d 199, 204 (5th Cir. 1991). However, this alone does not confer upon this court post-confirmation jurisdiction to review Jones Walker's fees.

Although bankruptcy court jurisdiction is more limited after confirmation than it is before a plan is confirmed, *In re U.S. Brass Corp.*, 301 F.3d 296, 303-305 (5th Cir. 2002), bankruptcy courts retain jurisdiction after confirmation over "matters pertaining to the implementation or execution of the plan." *Id*. at 304 (citation omitted). Specifically, the Fifth Circuit recently held in *Matter of Network Cancer Care, L.P.*, 197 Fed. Appx.

13

284, 285, 2006 WL 2034425 (5th Cir. 2006)[43] that review of fees paid for post-confirmation legal services, and orders requiring disgorgement of those fees, remained within the bankruptcy court's jurisdiction after a plan is confirmed. Moreover, ordering professionals compensated from the estate to disgorge fees lies within the court's inherent authority to regulate professional compensation in bankruptcy proceedings. *Prudhomme*, 43 F.3d at 1003.

Accordingly, the fees CalMed paid without court approval to both Jones Walker and itself remain subject to disgorgement.

Both the Confirmed Plan and court order specifically directed CalMed to bill and collect Charis's receivables and regularly report to the court regarding its progress. It disobeyed these directives and also resisted production of information to parties in interest. Moreover, CalMed paid some administrative priority claims, but not others, for reasons that are impossible to divine from the record. CalMed also paid substantial sums both to itself and its attorney without court approval, despite unambiguous orders requiring it to obtain court approval for those payments.

Although *Matter of Barron*, 225 F.3d 583, 585-6 (5th Cir. 2000) limits a bankruptcy court's review of professional compensation where the court previously had approved a compensation scheme, here orders specifically required court approval of CalMed's and Jones Walker's compensation. CalMed's actions in its capacity as liquidator were inconsistent with the plan and court orders, and as a result the court will order it to disgorge all fees it received.

---

[43] Unpublished opinion. *See* Fifth Circuit Rule 47.5.4. An unpublished opinion can be persuasive and, indeed, *Matter of Network Cancer Care* provided sufficient guidance on a unique point of law to have merited publication, in this court's view.

14

Jones Walker's representation of the liquidator also leaves much to be desired. The firm failed to assure the submission of the liquidator's required monthly reports. The firm also failed to prepare and submit orders, including one concerning the fidelity bond and another memorializing the court's March 15, 2002 rulings approving administrative claims and authorizing a reserve for disputed claims. As a result, no bond is available from which parties in interest can pursue payment of unpaid allowed claims, and the administrative claims that were allowed cannot be determined -- if any funds even remain or can be recovered to pay those claims.

Despite these serious oversights, CalMed's counsel did initiate and conclude numerous avoidance actions and other motions to facilitate the liquidation.

The court has reviewed the fee application Jones Walker eventually filed pursuant to the court's order. According to Mr. Miller's review of the CalMed records, the firm billed the liquidator $92,245.23, and has been paid $76,260.04.[44] Using as a guide the factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974), *overruled on other grounds Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), much of Jones Walker's professional fees were reasonable and appropriate.[45] However, the application is deficient in several respects.

---

[44] See Exhibit UST 5.

[45] Those guidelines are:

    (1) The time and labor required.
    (2) The novelty and difficulty of the questions.
    (3) The skill requisite to perform the legal service properly.
    (4) The preclusion of other employment by the attorney due to acceptance of the case.
    (5) The customary fee.
    (6) Whether the fee is fixed or contingent.
    (7) The time limitations imposed by the client or the circumstances.
    (8) The amount involved and the results obtained.
    (9) The experience, reputation, and ability of the attorneys.

First, Jones Walker charged fees of $1,803.75 for services it performed before the court approved its employment.

Second, the firm charged more than $200 per hour for many hours of services of Michael Perry, lead counsel on the engagement, whose hourly rate was set at $200 in the application for employment. However, some of Mr. Perry's time was billed at $185 per hour. Jones Walker's fee request will be reduced by $3,675.10, the difference between the value of time billed at various rates over $200 per hour and that billed at $185.

Third, the firm's time records submitted with the compensation application reflect numerous entries where time spent on separate tasks was lumped together, a practice disapproved by most bankruptcy courts and specifically barred by Local Rule 2016-1(a)(9)(C). The fees for services described in this manner total $13,040, and the court disallows half of that sum, or $6,520.

Finally, Jones Walker billed $34,728 for representing the liquidator in litigation Bank One, N.A. filed against the Carrolls (Case. No. 02-1079) and the Carrolls filed against Bank One and others (Case. No. 02-1004). The court remanded the first adversary proceeding to state court on December 6, 2002, four months after the liquidator intervened and removed it to federal court. Six days later, on December 12, 2002, the second case was dismissed for lack of jurisdiction. Neither Jones Walker nor CalMed have not proven that the Charis creditors derived any benefit from this litigation. Accordingly, the court will reduce Jones Walker's fees for the Carroll litigation by

---

(10) The "undesirability" of the case.
(11) The nature and length of the professional relationship
    with the client.
(12) Awards in similar cases.

*Johnson*, 488 F.2d at 718-719.

16

$13,884, which represents one-half of the fees charged for the Carroll litigation, minus $3,480 previously deducted from Jones, Walker's fees due to hourly billing over $200.

In sum, the court approves the compensation paid to Jones Walker in the amount of $66,362.38, but disallows the $15,985.19 in fees Jones, Walker has not been paid and will order the firm to disgorge $9,897.66 of the fees it received.

## II.    Liquidator's Final Report

The materials attached to the Supplemental Motion to Appoint Liquidators portray CalMed as experienced in health care accounts receivable management.[46] However, the evidence supports a finding that Calvaruso and CalMed miscalculated the amount of work CalMed would have to perform as Charis's liquidator, and so was ultimately overwhelmed by problems collecting the Charis receivables. Its difficulties collecting the receivables required greater resources than CalMed anticipated when it accepted the appointment, and also resulted in CalMed's receiving less income from the project than the liquidator hoped. Despite this, CalMed never sought relief from the October 26, 2001 order appointing it, and never sought to resign. Instead, it delayed the parties and the court by repeatedly resisting the parties' efforts to obtain information concerning the progress of its work.

CalMed should have known that it remained obligated to provide periodic reports of its progress collecting the debtor's receivables and paying claims. The Confirmed Plan and the February 8, 2002 court order unambiguously required it to do so. CalMed offered no corroboration for its understanding that Judge Phillips relieved the liquidator of its charge. Ultimately, parties in interest were compelled to involve the court by moving repeatedly for orders requiring CalMed to fulfill its obligation to file monthly

---

[46] Exhibit 2 to P-373.

reports after its first January 2002 report. Had CalMed made that information accessible to parties in interest, they could have assessed its progress and perhaps have been able to fashion a remedy that would have spared all parties expense and brought about a more favorable result.

Finally, CalMed, allegedly on the advice of its counsel, paid only $350,000 of the IRS chapter 11 administrative claim, instead of the full $457,000 claim. As a result, penalties and interest increased the claim by $62,000. The United States Trustee established that CalMed could have paid the IRS claim in full in May 2002 had it not paid its fees, legal fees (including those of its attorney) and other administrative expense claims that the court had not approved. It also failed to set aside a reserve for disputed claims, ensuring that similarly situated administrative priority creditors would not be paid if their claims eventually were allowed.

CalMed's errors and omissions, together with those of its counsel, have created significant problems that cast doubt on the accuracy of the liquidator's final report. As a result, the court declines to approve the report.

## Conclusion

The outcome here underscores the risk of unsupervised liquidations after plan confirmation, and need for diligence by all parties in interest and their counsel to guard against frustrated expectations. An unhappy outcome for many of Charis's creditors may have been inevitable, but the result may have been ameliorated had the parties involved in the case taken more interest in the liquidation process once Charis's plan was confirmed.

CalMed by separate order will be directed to disgorge to the chapter 7 trustee all fees and expenses paid to it. Its counsel, Jones Walker, will be awarded fees of $66,362.38, costs of $2,543.73 and directed to disgorge $9,897.66 of the fees it received. Finally, the court will enter a separate order denying approval of the liquidator's final report.

Baton Rouge, Louisiana, January 19, 2007.

<u>**s/ Douglas D. Dodd**</u>
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE